IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JEROME P. NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:11cv861-MHT |
| | ) | (WO) |
| GKN WESTLAND AEROSPACE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Plaintiff Jerome Norris brought this lawsuit against
his former employer, defendant GKN Westland Aerospace,
Inc., for violations of the Americans with Disabilities
Act of 1990 (ADA), as amended (42 U.S.C. §§ 12101 et
seq.) and the Family and Medical Leave Act of 1993 (FMLA)
(29 U.S.C. § 2611 et seq.). Jurisdiction is proper under
28 U.S.C. § 1331 (federal question), 42 U.S.C. § 12117
(ADA), and 29 U.S.C. § 2617 (FMLA).

The matter is before the court on Westland's motion
for summary judgment. For reasons that will be
discussed, the motion will be denied.

## I. BACKGROUND

Norris worked at Westland's manufacturing facility in Tallassee, Alabama.  Approximately 1,000 employees work at this facility, manufacturing and assembling components used in aircraft such as Blackhawk and Seahawk helicopters.  Norris assembled cargo doors for these helicopters; he also worked in small assembly and metal panels and at one time made German swivel doors.

Norris began working for Westland in March 2008.  He was hired through and initially worked under the auspices of a temporary agency.  But in July 2008 he took a regular position with Westland.  For two years he worked the first shift, from 5:00 a.m. to 5:30 p.m., five days a week; in July 2010, however, Westland transferred him to third shift, and his hours were then 10:00 p.m. to 6:00 a.m., or 9:00 p.m. to 8:00 or 9:00 a.m.; and, on December 8, 2010, several months after his shift change, he was terminated.

2

In October 2009, Norris was diagnosed with Diabetes Type II and high blood pressure. As a result of his diabetes he experiences foot swelling and increased urine production. He also suffers from neck, back, and foot pain, making it difficult for him to stand for extended periods of time. Managing his diabetes requires that he monitor his blood-sugar level two to three times a day and follow a routine work, exercise, and nutrition plan.

When Norris received his diabetes diagnosis, he spoke with then-supervisor Richard Hill regarding his condition. He sought several accommodations, including the ability to take frequent trips to the restroom as needed and permission to manage his blood sugar with breaks for food and drink. Hill granted these accommodations and did not interfere when Norris exercised them. Norris also requested and received permission to take intermittent FMLA leave beginning October 2009. He took three days of such leave in 2009.

3

Unfortunately, Hill was the first and last supervisor to handle Norris's medical problems without incident. According to Norris, his next supervisor, Cliff McGuiness, commented on his frequent need to use the restroom and teased him in front of other workers. Following him into the break room, McGuiness would quip: "Gee Preacher, ... you going to get that medicine together, man.  You'[r]e going to have to get that diabetes under control.  I - I can't have you in this break room too much."  Norris Dep. (Doc. No. 28-1) at 30, 115:22-116:4.

When Jeff Henderson replaced McGuiness things went from bad to worse for Norris.  Norris reports that Henderson would follow him to the restroom and break room and confront him about how long he had been gone after he returned to the floor.  Fed up, Norris took Henderson to Human Resources (HR) to report the conduct.

Production Manager Donna Hornsby intercepted Norris and Henderson on their way to HR.  She led them into an

4

HR office where no HR personnel were present.  There, Norris informed Hornsby of his belief that Henderson was "harassing [him] because of [his] diabetic conditions." Id. at 28, 105:13-15.  Less than two weeks later, Hornsby transferred Norris from the first to third shift.

In the spring of 2010, Norris had managed to get his diabetes under control and did not need any FMLA leave. But from June 29, 2010, through December 2010 he took 27 days of FMLA leave.  Norris attributes this dramatic increase in medical leave to the shift transfer, which required him to work through the night.  The change at work disrupted the routine he had developed to manage his diabetes and brought on a fresh wave of symptoms.  As FMLA leave is unpaid, it also affected his pay.  And since Westland would not allow Norris to work weekends unless he had worked 40 hours during the week, his need for medical leave further undercut his income.[1]

---

1.   Westland asks that the court not consider Norris's contention that it prohibited him from working weekend overtime when he was out on FMLA leave during the

(continued...)

5

The third-shift transfer also brought Norris under
new supervision.  The third-shift supervisor, Steve
Gaddis, would comment when Norris took FMLA leave,
saying, "Rev., what you trying to do, get disability."
Id. at 32, 121:18-19.  He "picked at" Norris about his
feet swelling, id., and, on at least two occasions,
Gaddis told him he was taking too much FMLA leave and
advised him that HR had noticed.  In November 2010,
Gaddis warned him: "Rev., you're going to have to watch

---

(...continued)
week.  It argues that, as he did not identify this denial
of overtime as retaliatory or discriminatory in his
complaint, he cannot now allege it here.  The court,
however, understands Norris to introduce evidence of this
practice as but one way in which the third shift transfer
was a negative employment action.  The court will
consider it for this purpose.  Westland also objects that
the statement in Norris's declaration that he was denied
weekend overtime should not be relied upon, as it is
"sham testimony."  Mot. Strike (Doc. No. 37) at 5-6.  It
argues that, because he did not identify denial of
overtime when asked what Westland did to discriminate or
retaliate against him, he cannot allege it in a
declaration subsequent to a deposition and thereby create
a genuine dispute.  Again, however, the court does not
understand Norris to claim that denial of overtime was a
separate act of retaliation or discrimination.  As such,
the evidence is proper.

your FMLA.  They talking up in HR."  Id. at 32, 122:12-17.  When asked what he meant by that, Gaddis told Norris: "Just try to be here as much as you can."  Id.

Occasionally Norris worked through the end of the third shift, into the first.  On those occasions he worked under supervisor Blake Allen.  Allen was not receptive to Norris's need for frequent restroom and break room visits.  Although aware that Norris was diabetic, Allen told him he "need[ed] to stay out of the break room."  Id. at 33, 126:23-127:1.

Norris received warnings from upper management as well.  One day in late November 2010, when he was leaving work after the end of a shift, Hornsby called him over.  She said: "I'm going to have to have somebody around here that can work when I say they work, ... or they going to hit the door."  Id. at 49, 191:9-12.  Norris replied that he was going home at the end of his shift, as his ankles and feet were swollen.  According to him, Hornsby did not

7

appear satisfied by this response.  She waved him out the door.

On December 3, 2010, while out on FMLA leave, he was suspended.  On December 8, 2010, HR called Norris and fired him.  The official reason given was poor-quality workmanship.

## II.  SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

8

## III.  DISCUSSION

Westland moves for summary judgment on Norris's ADA disparate-treatment and retaliation claims and his FMLA interference and retaliation claims.  The court will address the merits of each claim in turn.

### A.  <u>ADA Disparate-Treatment Claim</u>

The ADA makes it unlawful for an employer to discriminate on the basis of disability in regards to the "terms, conditions, and privileges of employment," including "discharge of employees."  42 U.S.C. § 12112(a).  Employees may claim unlawful discrimination under the ADA by showing either that the employer's facially neutral conduct had a disparate impact on members of a protected class (disparate impact) or that the employer treated certain employees worse than others because they possessed a protected trait (disparate treatment).  <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 52-53 (2003).

9

Norris's ADA claim alleges disparate treatment. Liability thus "depends on whether the protected trait... actually motivated the employer's decision." <u>Id</u>. (omission in original) (quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)). Norris can make this showing with circumstantial evidence. A circumstantial case of discrimination may be made using the burden-shifting framework outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973), or by "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." <u>Hamilton v. Southland Christian School, Inc.</u>, 680 F.3d 1316, 1320 (11th Cir. 2012) (quoting <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011)).[2] "A

---

2. Neither <u>Smith</u> nor <u>Hamilton</u> involved a claim of disability discrimination under the ADA. <u>Smith</u> was a Title VII race-based discrimination case and <u>Hamilton</u> sex-based. However, the test for discriminatory intent is the same across these contexts. Indeed, courts in this circuit have understood <u>Smith</u>'s logic to apply to ADA claims. <u>See</u> <u>Bruce v. Sam's East, Inc.</u>, No. 4:11CV636, 2012 WL 6733034, at *3 (N.D. Fla. Dec. 28, 2012) (Hinkle, J.) (assuming, without comment, that an

(continued...)

triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination." Id.

Under the McDonnell Douglas framework, the plaintiff first must make out a prima-facie case of discriminatory treatment. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004). A prima-facie case of discriminatory treatment under the ADA requires a showing that (1) the plaintiff has a disability, (2) is otherwise qualified to do the job, and (3) was unlawfully discriminated against because of his disability. 42 U.S.C. § 12132; see Cleveland, 369 F.3d at 1193.

Once the plaintiff establishes his prima-facie case, the burden shifts to the defendant employer to offer evidence that the contested action "was taken for some

―――――――――――

(...continued)
employee need not proceed under McDonnell Douglas and may "present other evidence from which a reasonable factfinder could infer prohibited discrimination or retaliation" and citing Smith, 644 F.3d at 1328).

11

legitimate, non-discriminatory reason." Smith, 644 F.3d at 1325 (quoting EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)).  If the defendant satisfies its burden of production, the burden shifts back to the plaintiff, who must then produce evidence to reveal the defendant's stated rationale as "a pretext for unlawful discrimination."  Id. at 1326.  Since the plaintiff bears the ultimate burden of persuasion, "if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination."  Id.  If so, summary judgment must be denied and the case put to a jury.

Westland's summary-judgment motion is based largely on Norris's perceived inability to satisfy the McDonnell Douglas requirements for a prima-facie case.  But "establishing the elements of the McDonnell Douglas

12

framework is not... the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith</u>, 644 F.3d at 1328 (quoting <u>Silverman v. Bd. of Educ.</u>, 637 F.3d 729, 734 (7th Cir. 2011)).   Rather, "the plaintiff will always survive summary judgment if he presents.... 'a convincing mosaic of circumstantial evidence.'"   <u>Id.</u>; <u>see also</u> <u>Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1256 (11th Cir. 2012) (finding enough circumstantial evidence of pregnancy discrimination for plaintiff to survive summary judgment without <u>McConnell Douglas</u> analysis); <u>Hamilton</u>, 680 F.3d at 1320 (same).

Norris alleges that Westland took two negative employment actions against him on account of his disability: transfer and termination.   He has put forth enough circumstantial evidence of discrimination to survive summary judgment on both claims.

1.  <u>Transfer</u>

Westland transferred Norris to the third shift on July 20, 2010.  The transfer came less than two weeks after he told Hornsby that his supervisor harassed him when he took medically necessary work breaks.  Hornsby herself effected his transfer to third shift.  Both the timing of this transfer and the fact that Hornsby was the decisionmaker are circumstantial evidence of discriminatory intent.

Norris also points out that he was not the least senior employee in his department and yet was picked for transfer.  Although Westland contests this fact, Norris has put forth enough evidence to put the question to a jury.  In his declaration, Norris states that employee Larry Spivey was hired after him and worked as a cargo-door builder, yet was not transferred.  Westland's personnel records confirm that Spivey was hired after Norris, as they show a hire date for Spivey of July 2009.  Pers. Rec. (Doc. No. 31-21) at 3.  Norris had been

14

working for Westland for over a year by the time Spivey was hired.

Westland contends that, because employee Winston Bedgood was transferred at the same time as Norris and because Bedgood is not disabled, the transfer decision "affect[ed] employees both inside and outside a protected class" and is therefore "non-discriminatory per se." Def. Br. (Doc. No. 27) at 19. Neither Westland's assertion nor the case law cited in support of it withhold scrutiny. This is not a case where "every single employee ... faces the same change in the terms and conditions of his employment." Id. (quoting Ginger v. District of Columbia, 477 F. Supp. 2d 41, 51 (D.D.C. 2007) (Sullivan, J.)). Hornsby testified that 70 % of Westland's employees work the first shift and only 10 % work the third shift. She also testified that no employees were transferred unless they requested transfer or had the least seniority. Thus, while all employees were subject to transfer, only a small fraction were in

fact transferred and Westland had definite criteria in place to guide its transfer decisions.   Norris has pointed to evidence that could lead a reasonable jury to conclude Westland departed from its standard practice regarding shift transfers when it transferred him, and that it did so because of his disability.

Norris has also offered evidence that Westland's "legitimate, non-discriminatory reason" for transferring him is mere pretext.   <u>Smith</u>, 644 F.3d at 1325 (quoting <u>Joe's Stone Crabs</u>, 296 F.3d at 1272).   Hornsby stated that she made the transfer because she needed more manpower on the third shift, and that she chose Norris because he had the least seniority.   As discussed, Norris has called into question whether he was actually the least senior employee in his department at the time of the transfer.   "Uneven application of criteria is strong evidence that the criteria were never in fact employed... and were used by the employer as merely a pretext for discrimination."   <u>Thompkins v. Morris Brown College</u>, 752

16

F.2d 558, n.16 (11th Cir. 1985) (quoting <u>Sims v.
Montgomery County Com'n</u>, 544 F. Supp. 420, 427 (M.D. Ala.
1982) (Thompson, J.)).   Furthermore, although Norris was
fired just five months after the transfer, Westland left
his position unmanned following his termination.
Norris's co-worker, Traywick Buckhannon, testified that
no one else was moved to third shift to replace Norris.
He also testified that two months after Norris's
termination Westland discontinued its third-shift
assembly operation altogether.   This undermines Hornsby's
assertion that the transfer was needed for allocation of
manpower.   <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802
(finding plaintiff raised inference of discrimination by
showing employer left position unfilled after passing
over plaintiff's application).   A reasonable jury could
infer that the need to staff third shift was overblown
and that Hornsby made the transfer to punish Norris for
taking medically necessary breaks.

17

Because the court finds Norris has put forth a triable case that his disability motivated his shift transfer, summary judgment is inappropriate on this claim.

### 2. <u>Termination</u>

As for Norris's claim that his disability motivated his termination, Westland argues that summary judgment is due because there is no similarly situated employee for comparison.  Westland also contends that it fired Norris for a legitimate, non-discriminatory reason: poor workmanship.

To support his claim that Westland terminated him because he is disabled, Norris compares himself to non-disabled coworkers who also exhibited poor-quality workmanship but were not fired.  The court agrees with Westland that Norris has not offered sufficient evidence for the court to evaluate whether he and his comparators are similarly situated in "all relevant respects," as

18

required under the McDonnell Douglas framework. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). But "failure to produce a comparator does not necessarily doom the plaintiff's case." Smith, 644 F.3d at 1328.

Norris's circumstantial case of discrimination is similar to the facts in Smith. 644 F.3d at 1341. That case involved a white employee's claim that his employer fired him because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The employee showed that, although he sent racially offensive emails in violation of his employer's "zero tolerance policy," African-American employees who sent similar emails received lighter treatment. Smith, F.3d at 1327. He also demonstrated that his termination was part of a larger discriminatory pattern and that his employer had an incentive to subject its white employees to a stricter code of conduct than its African-American employees. Id. at 1344. The Eleventh Circuit agreed with the district court that the

19

employee did not make a prima-facie case under McDonnell Douglas, because he failed to identify an African-American comparator, id. at 1326-27; the appellate court agreed he could not identify a comparator because he was a supervisor and therefore subject to a stricter code of conduct than the African-American non-supervisor employees who sent similar emails.  Id.  Nonetheless, it found the employee "[did] not need a black supervisor comparator" as he had made a triable case of discrimination without one.  Id. at 1327.

Norris, too, has made a triable case of discrimination without a comparator.  He received multiple warnings from his supervisors that he stop taking medically necessary breaks and medical leave.  His third-shift supervisor, Gaddis, commented it seemed he was trying to get disability and warned him twice about taking too much medical leave because "they talking up in HR."  Norris Depo. (Doc. No. 28-1) at 32, 122:12-19. Allen, his supervisor when he worked overtime, repeatedly

told him he took too many breaks and that he "needed[ed]
to stay out of the break room."  <u>Id</u>. at 33, 126:22-
127:1).   These direct supervisors all reported to
Hornsby, who herself warned him she needed to "have
somebody around here that can work when I say they work,
or ... they going to hit the door."  <u>Id</u>. at 49, 191:5-12.[3]
Norris has also introduced evidence that these comments
were part of a larger pattern of harassment on the part
of his supervisors at Westland, who, with the exception
of Hill, all indicated their dissatisfaction with the
fact that his diabetes management required him to take
breaks from the assembly floor.

Like the <u>Smith</u> plaintiff, Norris has shown evidence
that his employer had an incentive to discriminate

_____

        3.  Gaddis, Allen, and Hornsby all participated in
the decision to terminate Norris.  Westland states that
Hornsby was not a decisionmaker because she was on leave
caring for her mother when Norris was fired.  But she
admitted in deposition testimony that she was consulted
by telephone about the termination.  And though Allen's
name is not on the termination letter, he met with other
supervisors about firing Norris and was on the conference
call that communicated the decision to Norris.

against him.   Though he had previously taken minimal medical leave, in the five months leading up to his termination he required 27 days off work for medical reasons.   In fact, Norris was on medical leave when Westland suspended him on December 3.   The timing of Norris's termination so soon after this spike in medical leave, together with the pointed comments of his supervisors, would allow a reasonable jury to infer discrimination.

Westland responds to this showing by painting these admonitions from supervisors as "stray remarks" non-probative of discriminatory intent.   It cites Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002).

In Scott, the Eleventh Circuit held that a discriminatory statement made about an employee two and a half years before the employee's termination that did not "directly relate[] to the subject of [his] termination" was not direct evidence of discriminatory

intent.  Id. at 1228.  It did consider this temporally remote statement as circumstantial evidence of discrimination, but required some additional evidence before concluding that the employer's stated reason for the action was a pretext for discrimination.  Id. at 1229-30.

The remarks Norris cites as evidence of his employer's discriminatory intent in firing him are more probative than the comment in Scott.  Norris's supervisors made the contested comments in the days, weeks, and months before his termination.  Two of the more explicit warnings, courtesy of Gaddis and Hornsby, came at the tail end of November, 2010, right before Norris's December 3 suspension and December 8 termination.  These remarks also directly touch on the subject of Norris's termination, as they invoked the threat of HR action and "hit[ting] the door."

Furthermore, Norris has pointed to additional evidence that Westland's non-discriminatory basis for his

termination--poor-quality workmanship--was a pretext.  He shows that other employees also exhibited sub-par workmanship but were not terminated.   None of these employees appears similarly situated in "all relevant respects," as required under <u>McDonnell Douglas</u>. Nonetheless, a comparison of several of these other employees with Norris is further evidence that Westland treated his errors more seriously than it did those of its non-disabled employees.

In meting out employee discipline, Westland considers "[a]n associate's past record, length of service, and the circumstances surrounding any specific incident."   GKN Assoc. Info. Guide (Doc. No. 28-2) at 46.   Norris compares himself to Michael Bentley, a current employee who was hired at the same time as him.   Nine reports of material deficiencies (MDRs) were issued for parts Bentley worked on, and five MDRs were issued for parts Norris worked on.[4]  The court agrees Bentley and Norris

---

4.  One of Norris's MDRs was not entered until three
(continued...)

are similarly situated in terms of past record and length
of service.

However, Westland's discipline policy also considers
the "circumstances surrounding any specific incident."
Id.  The specific incidents for which Westland claims it
terminated Norris are explained in a letter dated
December 8, 2010.

The letter begins by noting that Norris received a
written notice for poor-quality workmanship on August 10,
2010.  The written notice to which this refers in turn
sets out three workmanship issues.  Two of those issues
are described as "hand backs," meaning they can be
repaired.  The third, a "potential scrapped part," is
more serious.  The written warning states that "Holes

_____

(...continued)
months after he was terminated.  Pl. Ex. (Doc. No. 35-3)
at 24.  As Westland does not appear to have been aware of
this material deficiency at the time it terminated him,
it is irrelevant to Westland's motive to fire him.
Moreover, though a spreadsheet created by Westland shows
this deficient part was scrapped, Pl. Ex. (Doc. No. 35-
7), the actual MDR reads: "Majority of door assy [sic]
was able to be salvaged... was issue adjusted back into
stock."  Pl. Ex. (Doc. No. 35-3) at 24.

were not drilled in the part while it was in the fixture resulting in shy edge distance – cost potential $20,500." Written Notice (Doc. No. 28-2) at 96.  The December 8 termination letter then identifies two further workmanship issues: a mis-drilled cargo door and a mis-drilled "German Swivel Door," each with a cost-potential in the tens of thousands.

While Bentley is an appropriate comparator as to length of service and past record, Norris has not shown a basis for comparing the circumstances outlined in his termination letter to any of Bentley's errors.

He has, however, introduced evidence that other operators made similar errors but were not written up for them.  Tony Scott, Norris's first supervisor, states that two other employees, Chris Messer and Tommy Willis, worked on German Swivel doors with Norris.  Scott remembered that between 40 and 50 such doors were returned to Westland from the customer.  Yet Norris alone was written up.  According to Scott, "Messer and Willis

made the same or similar errors and were not written up
for the mistakes they made." Scott Decl. (Doc. No. 35-2)
at ¶ 9.[5]

Indeed, Hornsby testified that to her knowledge
Westland has yet to produce successfully a single German
Swivel door. Norris testified that he did not want to
work on the German Swivel doors because he did not have
good parts to build the doors with and that he
communicated this to his supervisors. Furthermore,
Norris last worked on the German Swivel doors in April

---

5. Westland objects to this statement and others in
Scott's declaration as lacking in personal knowledge,
conclusory, and based on subjective belief. Mot. Strike
(Doc. No. 37) at 6-7. Examination of the declaration
shows that these objections are without merit. Scott
avers to personal knowledge of all facts in his
declaration "unless otherwise stated." Scott Decl. (Doc.
No. 35-2) at ¶ 1. He also provides a basis for his
knowledge, as he attests to having worked for Westland
for 26 years until he was laid off in July 2012. While
he did not directly supervise Norris during the events in
question, he worked in a supervisory capacity during the
relevant time period. On motion for summary judgment
courts consider all evidence "which can be reduced to an
admissible form." Rowell v. BellSouth Corp., 433 F.3d
794, 800 (11th Cir. 2005). Scott's statements meet this
minimum threshold and their consideration is therefore
appropriate.

2010.  While Westland contends that it did not discover this workmanship error until December 2010, a reasonable jury could equally infer from this long delay that Westland went back over Norris's work to provide justification for its decision.

As additional evidence that Norris's write-ups were pretextual, the court notes that Bentley received nine MDRs, including two for scrapped parts, yet his personnel file does not reveal a single write-up.  Norris, on the other hand, was written up for two "hand backs" that did not even result in MDRs.

Scott explains that Westland supervisors exercised significant discretion in writing up employees for errors.  According to him, there were "situations where operators would make mistakes and not get written up and other instances where operators would make the same or similar mistakes and would be written up."  Id. at ¶ 7. As to the first "hand back" listed on Norris's August 10 write-up, Scott states that "in [his] experience at GKN

28

operators got hand backs frequently for these and other similar issues and were not written up." Id. at ¶ 8.

An employee may rebut his employer's legitimate, non-discriminatory reason for taking a contested action by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont De Numours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc)); see also Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194-95 (11th Cir. 2004) ("once [the employer's] credibility was damaged, a rational jury could infer that he did not fire [the defendant] because of [the legitimate reason], but rather because of her disability."). Norris has introduced evidence from which a reasonable jury could conclude that Westland's explanation of poor-quality workmanship was drummed up or

contrived.  Summary judgment is therefore unavailable on this claim.

B.  <u>ADA Retaliation Claim</u>

The ADA's retaliation provision makes it unlawful to discriminate against any person who "opposed any act or practice made unlawful" by the ADA.  42 U.S.C. § 12203(a).  "Acts or practices made unlawful" by the ADA include "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any individual in the exercise or enjoyment of... any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  Norris claims Westland retaliated against him when it transferred him to the third shift; he alleges that the transfer was punishment for complaining about Henderson's harassment and that the harassment interfered with his exercise or enjoyment of the reasonable accommodations Westland had made for his diabetes.

To establish a prima-facie case of retaliation under the ADA, Norris must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998).  If he succeeds in making a prima-facie case, then Westland must offer a legitimate, non-retaliatory reason why it took the contested employment action.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).  The burden then shifts to Norris to offer evidence from which a reasonable jury could infer that the employer's explanation is but "a pretextual ruse designed to mask retaliation."  Id.

Westland contends summary judgment is warranted because Norris has not established the third element of his prima-facie case: a causal link between the transfer and protected activity.  In order to meet this hurdle, Norris need only establish that "the protected activity

and the adverse action were not wholly unrelated." Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). Just as this court has found Norris introduced enough circumstantial evidence that the transfer was discriminatory, it also finds that he has made a triable case of retaliatory intent. A reasonable jury could use the same evidence to infer that Hornsby's motive in transferring Norris to a less desirable shift was to punish him for speaking out about Henderson's harassment.

Westland also argues that summary judgment is inappropriate because it has offered a non-retaliatory reason for the transfer which Norris has failed to rebut. It reiterates its position that it transferred Norris to allocate manpower to a later shift. This is a legitimate, non-retaliatory purpose. The court has already concluded, however, that Norris introduced evidence showing he was not the least senior employee in his department when he was forcibly transferred and that

32

the need for more manpower on third shift may have been exaggerated or false.

Norris points to evidence that would justify a jury finding Westland's proffered explanation a pretext for retaliation.    Summary   judgment   is   therefore   not appropriate on this claim.

C.  <u>FMLA Violations</u>

The   FMLA   grants   eligible   employees   a   general entitlement to 12 workweeks of medical leave a year.   29 U.S.C. § 2612(a)(1)(D).   It also guarantees the right to be   restored   "by   the   employer   to   the   position   of employment held by the employee when the [medical] leave commenced" or to a position equal to it.   29 U.S.C. § 2614(a)(1).   Two types of claims are available to plaintiffs seeking to vindicate their rights under the FMLA:   interference   claims   and   retaliation   claims. <u>Strickland  v.  Water  Works  and  Sewer  Bd.  of  City  of Birmingham</u>, 239 F.3d 1199, 1206 (11th Cir. 2001).

In this case, Norris alleges both an interference and a retaliation claim, and Westland seeks summary judgment on both.


   1.  <u>FMLA Interference Claim</u>

In an interference claim, an employee "asserts that his employer denied or otherwise interfered with his substantive rights" under the FMLA.   <u>See</u> 29 U.S.C. § 2615(a)(1); <u>Strickland</u>, 239 F.3d at 1206.  The employee "need only demonstrate that he was entitled to but denied the right."   <u>Id</u>. at 1208.   Unlike an ADA disparate-treatment or retaliation claim, whether or not the employer intended to interfere with its employee's substantive rights is not at issue; <u>id</u>., "the employer's motives are irrelevant."   <u>Id</u>.

Here, Norris has raised what is in essence a claim that Westland interfered with his right to have his job restored.   He testified that, on December 3, 2010, he "was on FMLA."   Norris Depo. (Doc. No. 28-1) at 47,

184:2.   When he came into work that day to pick up a
paycheck he was sent to see a supervisor.  The supervisor
gave him his paycheck, asked for his employee badge, and
told him he was suspended.  Westland fired him five days
later while he was on suspension.

In its argument for summary judgment on this claim,
Westland repeatedly cites the fact that it gave Norris
FMLA leave when he asked for it.  Def. Br. (Doc. No. 27)
at 25.  Westland seems to be under the mistaken
impression that obeying federal law most of the time
means it should win summary judgment all of the time.
Westland fails to address the fact that it suspended--and
then fired--Norris while he was making use of FMLA time,
even though he had a statutory right to reinstatement
following FMLA leave.  Westland's bald conclusion that
Norris "was never denied any benefit afforded under the
FMLA" thus rings false.  <u>Id</u>.

As Norris has shown interference with his right of
restoration, this claim survives summary judgment unless

"the record establishe[s] without dispute" that Westland fired him for "a reason wholly unrelated to the FMLA leave."   Strickland, 239 F.3d at 1208.   Westland's position that it fired Norris because of his poor-quality workmanship is unrelated to his FMLA leave.  However, the court has already concluded that a reasonable jury could review the evidentiary record in this case and decide to disregard Westland's stated rationale as pretext. Summary judgment on this claim is therefore inappropriate as well.

   2.   FMLA Retaliation Claim

   In a claim of retaliation under the FMLA, an employee "asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]." Strickland, 239 F.3d at 1206.  Retaliatory intent in the form of adverse-employment action is a required element of such claims.   Id. at 1207.   When confronted with circumstantial evidence, Courts apply the McDonnell

36

Douglas framework as explained earlier. Id. This
requires evidence that: (1) the employee engaged in
statutorily protected activity; (2) he suffered an
adverse-employment action; and (3) "there is a causal
connection between the protected activity and the adverse
action." Hurlbert v. St. Mary's Health Care System,
Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). Once an
employee makes such a showing, the burden shifts to the
employer to explain why it took the contested action.
Id. If the employer offers a legitimate, non-retaliatory
reason for its action, the burden shifts once again to
the employee, who must reveal the non-retaliatory reason
as pretextual. Id.

Westland seeks summary judgment on this claim on the
ground that Norris has not shown its poor-quality-
workmanship explanation a pretext for retaliation. It
also argues that its consistent record of allowing Norris
to take FMLA leave means it did not punish him for taking
leave.

The court has already determined a reasonable jury could choose to discount Westland's proffered reason for firing Norris.  Moreover, the evidence shows that Norris's use of FMLA leave skyrocketed in the weeks and months leading up to his termination.  A jury could infer from this evidence that, although Westland tolerated small amounts of leave in the past, it chose to intervene when Norris began taking leave with more consistency.  Indeed, he was exercising his right to FMLA leave at the time he was fired.  "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'"  Hurlbert, 439 F.3d at 1298.  As the court finds evidence that the real reason underlying Westland's decision to fire Norris was his use of FMLA leave, summary judgment on this claim is unwarranted.

                              ***

                              38

For the above reasons, it is ORDERED that defendant GKN Westland Aerospace, Inc.'s motion for summary judgment (Doc. No. 26) is denied.

DONE, this the 5th day of February, 2013.

　　　　　 /s/ Myron H. Thompson　　
　　　　 UNITED STATES DISTRICT JUDGE